UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2011 SEP 21  PM 4: 50

CLERK
BY _____ PM _____
DEPUTY CLERK

MARIE WINFIELD and JASON WINFIELD, )
)
     Plaintiffs, )
)
v. )          Case No. 5:08-cv-278
)
DANIEL TROTTIER, )
)
     Defendant. )

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Doc. 43)

Plaintiffs Marie and Jason Winfield bring this civil rights action under 42 U.S.C. § 1983 against Trooper Daniel Trottier of the Vermont State Police. Plaintiffs allege that Trooper Trottier violated their Fourth Amendment rights to be free from unreasonable searches and seizures, and their Fourteenth Amendment right to equal protection of the laws, during a motor vehicle stop that occurred on Interstate 89 in Vermont. Plaintiffs also allege violations of Chapter I, Article Eleven of the Vermont State Constitution, as well as false imprisonment, invasion of privacy, and intentional infliction of emotional distress under Vermont common law.[1]

Presently before the court is Trooper Trottier's motion for summary judgment on all claims. (Doc. 43.) On June 6, 2011, the court heard oral argument on the motion at which time the parties agreed to file a stipulated transcript of the audio recording of the incident.[2] The parties filed the transcript on July 28, 2011.

---

[1] Plaintiffs stipulated to the dismissal of their state law claims for negligence and negligent infliction of emotional distress. *See* Doc. 57 at 2.

[2] Exhibit A to Trooper Trottier's Statement of Undisputed Material Facts is a true and accurate copy of the video taken of the traffic stop by Trooper Trottier's cruiser camera, and the audio recorded by the microphone that Trooper Trottier was wearing, which the court has reviewed.

Plaintiffs are represented by Allison Ericson, Esq., Daniel M. Sedon, Esq., and Kelly Green, Esq. Trooper Trottier is represented by Assistant Vermont Attorneys General Megan J. Shafritz and Jana M. Brown.

## I.     Factual Background.

### A.     Undisputed Facts.

On the afternoon of May 26, 2007, Memorial Day weekend, Marie Winfield and her son Jason Winfield, who are both African American, were driving northbound on Interstate 89 in Vermont en route to Canada. At approximately 4:10 p.m., Trooper Trottier stopped Plaintiffs' vehicle for operating twenty miles in excess of the posted speed limit (85 mph in a 65 mph zone).

Trooper Trottier approached Plaintiffs' vehicle on the passenger's side. As he approached he observed what he later described as a "large diatribe taped to the rear window which was proclaiming the operator's dislike of authorities."[3] (Doc. 57-6.) Upon reaching the vehicle's passenger door, Trooper Trottier asked Ms. Winfield, who was in the driver's seat, for her license, registration, and proof of insurance. As Ms. Winfield provided this documentation, Trooper Trottier asked her where she was "heading in such a hurry." Ms. Winfield explained that she was traveling from North Andover, Massachusetts to Canada in order to visit her father who had recently suffered a stroke. She stated that this was her third recent trip to Canada, and that her most recent trip had occurred three weeks earlier. During this exchange, Trooper Trottier noticed that Jason Winfield purposefully avoided making eye contact with him.

Following his initial conversation with Ms. Winfield, Trooper Trottier returned to his cruiser to run a computer check on Ms. Winfield's information. After several minutes, Trooper Trottier returned to Plaintiffs' vehicle and advised that the check on Ms. Winfield's information was "going to be just a minute" longer. Trooper Trottier observed that Ms. Winfield was eating a snack in what he regarded as a hurried manner.

---

[3] Ms. Winfield has not kept possession of the sign, and there is no evidence in the record of what the sign actually said.

Trooper Trottier then asked Jason Winfield for his identification, and explained that the information check was taking longer than usual because there were a lot of people on the road that day.  A few minutes later, Trooper Trottier approached the driver's side of Plaintiffs' vehicle, and spoke to Ms. Winfield through the front driver's side window, stating: "Ms. Winfield, you don't have to if you don't want to, but while we're waiting, would you mind coming back here for a minute [behind the car] and talk[ing] to me for a second?"  In response, Ms. Winfield got out of the car, and both she and Trooper Trottier walked around to the back of Plaintiffs' vehicle.  At this point, Trooper Aimee Nolan arrived on the scene.

Once behind Plaintiffs' vehicle, Trooper Trottier gestured toward the sign fashioned to the rear window of Plaintiffs' car.  He asked Ms. Winfield: "What's with this?  What's with your window?"  Ms. Winfield explained that she was sponsoring a legislative bill in Massachusetts, and the sign on her car was an effort to promote the bill.  Trooper Trottier then said, "Listen, is there anything in there I should know about?  You seemed awfully nervous when I was talking with you. . . . Your hand was shaking and you're—you had, like, a leg tremor going on.  No?"  Ms. Winfield responded, "Not that I know of."  Trooper Trottier, responded: "Oh.  Okay.  Not that you know of, or there's nothing?  It just kind of, you know, piqued my interest there[.]"  Ms. Winfield remarked "Really?" to which Trooper Trottier responded:  "[B]ecause when I was talking with you, you were shaking; your voice was shaking."

Upon Trooper Trottier's request, Ms. Winfield identified her passenger as her son and explained that she was "probably tired" because her daughter's high school graduation was the preceding night.  The following exchange then occurred:

> **Trooper Trottier**: Okay.  Okay.  There's nothing in there I should know about is there?  No guns or money?
>
> **Ms. Winfield**: You can look if you want.
>
> **Trooper Trottier**: Oh you don't mind?  Do you mind?  No—no large sums of money in there or—no?  Okay.

3

**Ms. Winfield**:  Be my guest.

**Trooper Trottier**:  Okay.

**Ms. Winfield**:  You can look.

**Trooper Trottier**:  Okay.  Here.  Hold on one second.

**Ms. Winfield**:  Inside my trunk?

**Trooper Trottier**:  Okay.

**Ms. Winfield**:  I don't know (inaudible)—

**Trooper Trottier**:  Here.  Do me a favor, okay?

**Ms. Winfield**:  I don't have anything.

**Trooper Trottier**:  What's that?

**Ms. Winfield**:  No, I don't have anything in there.  My—

**Trooper Trottier**:  Okay.  Oh, just stay over here for a second.  I don't want you to get run over.  Do you mind?

**Ms. Winfield**:  I was just going to pop my trunk.

**Trooper Trottier**:  Oh, that's okay.  Do you mind if I look through—do—do you mind?  You don't mind?  Okay.  Do me a favor.  Stand over here for me.  You don't have anything on you we should know about, do you?  No guns or bombs or anything like that?

**Ms. Winfield**:  (Inaudible).

**Trooper Trottier**:  No?  Okay.  Just –I don't want you to get hurt.  If you stand over here for a minute.

**Ms. Winfield**:  (Inaudbile).

(Doc. 68-1.)

4

After instructing Ms. Winfield to stand to the side near Trooper Nolan, Trooper Trottier approached the front passenger door of Plaintiffs' vehicle. Through the passenger side window, Trooper Trottier asked Jason Winfield, "Do you mind stepping out [of the car] for a minute, please?" Trooper Trottier then opened the car door and asked Mr. Winfield, "Do you have anything on you I should know about? No? Or anything in the car I should know about? No? Okay." Mr. Winfield stepped out of the vehicle while these questions were being asked. Once Mr. Winfield was outside the vehicle, the following exchange occurred:

> **Trooper Trottier**: "Listen, your mother has given me permission to search the vehicle. Do you have anything on you? You're going to be standing out with this trooper right here. Do you mind if I pat you down real quick to make sure you don't have any guns or knives or anything? Do you have anything sharp on you I should know about?"

> **Mr. Winfield**: "No."

During this exchange, Mr. Winfield extended his arms away from his body, which permitted Trooper Trottier to complete a pat-down over Mr. Winfield's clothing which lasted approximately fifteen seconds. In his deposition, Mr. Winfield explained, " I was stretching or extending my arms . . . so he could search[.]" During the pat-down, Trooper Trottier felt an object that Mr. Winfield identified as a set of keys. Mr. Winfield removed the keys upon Trooper Trottier's request. After the pat-down, Trooper Trottier directed Mr. Winfield to stand on the far side of the road, away from the moving traffic on the Interstate, with his mother and Trooper Nolan and to "keep [his] hands out."

At this point, approximately seventeen minutes after the initial vehicle stop, Trooper Trottier began his search of Plaintiffs' vehicle. Trooper Trottier concedes that he began the search without any particularized suspicion of criminal activity, searching instead for "anything that might be illegal in the vehicle." (Doc. 57-4 at 29:18-19.) He checked the entire interior of the car as well as its contents, including the luggage and some of Ms. Winfield's mail which Trooper Trottier removed from its envelope and

5

read.[4]  He also checked the glove box, engine area, gas cap, and tires.  During his search, Trooper Trottier instructed Trooper Nolan to ask Ms. Winfield about a pair of rubber gloves and court documents referring to Ms. Winfield's husband.  After speaking with Ms. Winfield, Trooper Nolan advised Trooper Trottier that Ms. Winfield used the gloves to prevent grease from fried food from dirtying her hands and the car, and that Ms. Winfield did not recall the nature of any charges against her husband to which the court papers may have referred.

Trooper Trottier's search of the vehicle lasted approximately seventeen minutes. At no point during the search did Ms. Winfield instruct Trooper Trottier to stop searching.  When the search was complete, Trooper Trottier told Trooper Nolan that Plaintiffs could return to their vehicle.  A few minutes later, Trooper Trottier approached the passenger side of the vehicle and issued a speeding citation to Ms. Winfield.  After issuing the citation and advising Ms. Winfield to "slow it down for me," Trooper Trottier permitted Plaintiffs to proceed on their way.

The entire traffic stop, including the search of Plaintiffs' vehicle, lasted just under forty minutes.  Throughout the stop, Trooper Trottier, who was in uniform, spoke to Plaintiffs in an ordinary street tone of voice.  He did not display a firearm or other weapon, and did not use or threaten to use physical force.  During the traffic stop, Plaintiffs observed two other cars stopped by police officers in the same general vicinity. Plaintiffs do not know the race or ethnicity of the operators or passengers of these other vehicles.

Trooper Trottier concedes that he neither had a reasonable suspicion of criminal activity nor probable cause to support his search of Plaintiffs' vehicle.  He further testified that the "best practice" is to obtain a signed consent card when you search a vehicle by consent.  (Doc. 57-4 at 28).  He concedes that he did not obtain written consent in this case.

---

[4] This evidence has not been preserved.  It apparently consisted of a court document pertaining to the arrest of Ms. Winfield's husband "for possession" and a letter Ms. Winfield wrote to a judge.

Trooper Trottier does not recall ever reading someone's mail in the course of a vehicle search prior to the instant case. He testified that he did so in his search of Plaintiffs' vehicle because the mail appeared to be a document to or from a court, and he thought it might have something to do with conditions of release, probation, or parole.

Trooper Trottier received "corrective action" with regard to his search of Plaintiffs' vehicle because his search violated the Vermont State Police Code of Conduct, although the Vermont State Police Office of Internal Affairs found "no evidence to indicate that this was a racially motivated incident." (Doc. 57-5 at 1).[5]

### B.   Disputed Facts.

In her deposition, Ms. Winfield denied having leg tremors and testified that it was unlikely her hand was shaking while she interacted with Trooper Trottier. In contrast, Trooper Trottier avers that "as [he] spoke with Ms. Winfield, . . . she was having leg tremors and . . . her hand appeared to be shaking." (Doc. 44-7 ¶ 5.) As there is no contention that Trooper Trottier's search of Plaintiffs' vehicle was supported by a reasonable suspicion of criminal activity or probable cause, the court finds this factual dispute immaterial to the resolution of the pending motions.[6]

### II.   **Conclusions of Law and Analysis.**

In Counts One through Four of their Complaint, Plaintiffs allege violations of the Fourth Amendment arising out Trooper Trottier's search of their vehicle, his pat-down search of Mr. Winfield, and the duration of the traffic stop. In Counts Five and Six, they

---

[5] While the admissibility of this evidence has not been established, both parties refer to it in their arguments.

[6] The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). In other words, only "disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249.

allege violations of the Equal Protection Clause of the Fourteenth Amendment based upon Trooper Trottier's decision to further investigate Plaintiffs.[7]

In moving for summary judgment on all counts, Trooper Trottier contends that he is entitled to qualified immunity because he did not violate either of the Plaintiffs' Fourth or Fourteenth Amendment rights, and, even if he did, Plaintiffs do not allege violations of "clearly established" federal constitutional rights.  Plaintiffs oppose the motion.

### A.    Standard of Review.

In deciding a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party.  *Scott v. Harris,* 550 U.S. 372, 378 (2007).  Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *see also City of Burlington v. Hartford Steam Boiler Inspection and Ins. Co.,* 190 F. Supp. 2d 663, 669 (D. Vt. 2002).

To avoid summary judgment, the non-moving party must offer more than "mere speculation and conjecture[.]"  *Harlen Assoc. v. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir. 2001).  In assessing whether there are triable issues of fact, the court may rely on facts as depicted in an unaltered videotape and audio recording, even when such facts contradict those claimed by the nonmoving party.  *See Scott,* 550 U.S. at 379-81  (relying on video recording of police chase even though it contradicted the non-moving party's version of the material facts).

### B.    Qualified Immunity.

Qualified immunity shields government officials, including law enforcement officers, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *McEvoy v. Spencer*, 124 F.3d 92, 97 (2d Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity thus protects government

---

[7] The State of Vermont and Trooper Nolan were also named as Defendants in Plaintiffs' Complaint, but each has been dismissed.  The court granted the State's motion to dismiss, and Plaintiffs stipulated to the dismissal of Trooper Nolan. *See* Docs. 11, 65.

officials from lawsuits over errors made while reasonably performing their duties, whether resulting from "a mistake of law, a mistake of fact, or a mistake of mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). The privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As a result, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

"When a defendant invokes qualified immunity to support a motion for summary judgment, courts engage in a two-part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson*, 555 U.S. at 232).

If the plaintiffs' constitutional rights were not violated then the issue of qualified immunity need not be further addressed, since "where there is no viable constitutional claim, defendants have no need of an immunity shield." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (internal citations omitted).

### C. Plaintiffs' Fourth Amendment Claims.

Plaintiffs' Complaint raises three Fourth Amendment issues: (1) whether Trooper Trottier's search of Plaintiffs' vehicle violated Marie Winfield's Fourth Amendment rights; (2) whether Trooper Trottier's pat-down search of Jason Winfield violated the Fourth Amendment; and (3) whether Trooper Trottier's detention of Plaintiffs throughout the traffic stop violated the Fourth Amendment.

#### 1. Trooper Trottier's Search of Plaintiffs' Vehicle.

Plaintiffs argue that Trooper Trottier's search of their vehicle violated the Fourth Amendment because Trooper Trottier did not have probable cause to believe that the car contained evidence of criminal activity. Trooper Trottier does not dispute that he lacked a reasonable suspicion of criminal activity or probable cause to search. Instead, he argues

that the search was permissible because Ms. Winfield provided her voluntary consent. Plaintiffs dispute that Ms. Winfield's consent to search was voluntary, and argue that, even if it was, it did not include consent to search the entire vehicle.

The Fourth Amendment protects the "right of the people to be secure . . . against unreasonable searches and seizures," U.S. CONST. amend. IV.  The Supreme Court has held that warrantless searches of persons or private property, including automobiles, "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).  "One such exception is consent by the party to be searched." *Holeman v. City of New London*, 425 F.3d 184, 191 (2d Cir. 2005); *see also Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991) ("we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so").  In order for consent to be valid, it cannot be coerced, but instead must be "freely and voluntarily given." *Schneckloth v. Bustamante*, 412 U.S. 218, 222 (1973).

Where consent to search has been established, no Fourth Amendment violation may be found as "[i]t is axiomatic that consent to search would render an otherwise unreasonable warrantless search reasonable." *United States v. Carreno-Arias*, 2002 WL 31890949, at *4 (S.D.N.Y. Dec. 27, 2002); *see also Jimeno*, 500 U.S. at 250-51 ("[We have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.").

Here, Trooper Trottier must establish that not only was Ms. Winfield's consent voluntary, he must further establish that it authorized the full scope of his search.

> a.  *Whether Ms. Winfield's Consent was Voluntary.*

Trooper Trottier bears the burden of proving the voluntariness of Ms. Winfield's consent by a preponderance of the evidence. *See United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004).  To determine whether consent to search was voluntarily provided, "courts examine the 'totality of the circumstances' to determine whether the consent was 'a product of that individual's free and unconstrained choice, rather than a mere acquiescence to a show of authority.'" *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir.

10

1995) (quoting *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993)). When assessing a search challenged under the Fourth Amendment, "the ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *Garcia*, 56 F.3d at 422 (quoting *United States v. Sanchez*, 32 F.3d 1330, 1334-35 (8th Cir. 1994)).

In this case, in response to Trooper Trottier's questioning regarding whether her car contained guns, bombs, money, or anything else that should be brought to his attention, Ms. Winfield volunteered her consent to search, by stating: "You can look if you want," "Be my guest," and "You can look." Trooper Trottier inquired further, asking, "Do you mind if I look through—do—do you mind? You don't mind? Okay." There is no evidence that Trooper Trottier tricked or coerced Ms. Winfield into providing her unsolicited consent to search, and her consent was not obtained through coercion, or a threat or show of force. Indeed, prior to Ms. Winfield's volunteered consent, Trooper Trottier had advised her that she did not need to talk to him, and that she was not even required to exit her vehicle. Against this backdrop, it is difficult to discern how Ms. Winfield can reasonably claim her consent was involuntarily given.

Plaintiffs nonetheless argue that Ms. Winfield was "subjectively vulnerable" because she is an African American woman who was confronted by two white police officers in a rural area and was not informed of her right to refuse consent. These factors, while relevant in a totality of the circumstances analysis, do not negate the voluntariness of Ms. Winfield's consent for several reasons.

First, although Plaintiffs contend that Ms. Winfield was in a "rural area," it is undisputed her vehicle was stopped on a major interstate on Memorial Day weekend in the midst of relatively heavy traffic. She was accompanied by her adult son who was either present or in near proximity throughout her encounter with the male and female law enforcement officers, only one of whom had any meaningful interaction with Plaintiffs.

11

Second, although courts consider the subjective characteristics of individuals in determining the voluntariness of their consent,[8] Ms. Winfield's race and the presence of two law enforcement officers of a different race would not provide grounds for finding she was incapable of voluntarily consenting to a search of her vehicle. *See United States v. Mendenhall*, 446 U.S. 544, 558 (1980) (finding that a twenty-two-year-old African American woman with an eleventh grade education who was detained by several white police officers "was plainly capable of a knowing consent," and did in fact "freely and voluntarily" consent to a body search); *see also Levy v. Kick*, 2007 WL 2492036, at *7 (D. Conn. Aug. 30, 2007) ("There must be additional information besides the fact that the officer was wearing a uniform, badge, and gun to show that the consent was involuntary."). Here, Ms. Winfield appeared to be an intelligent, middle aged woman who immediately volunteered her consent in a normal speaking voice after voluntarily exiting her vehicle to speak to Trooper Trottier. There is no evidentiary basis for finding she was especially vulnerable or overwhelmed by the circumstances of the traffic stop.

Finally, although a factor in the court's analysis, Trooper Trottier was not required to advise Ms. Winfield of her right to refuse consent in order to establish that her consent was voluntary. *See Schneckloth*, 412 U.S. at 234 ("In short, neither this Court's prior cases, nor the traditional definition of 'voluntariness' requires proof of knowledge of a right to refuse as the sine qua non of an effective consent to search."); *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990) ("In determining voluntariness under [the Fourth Amendment] . . . knowledge of the right to refuse consent is only one factor in the analysis."); *United States v. Walker*, 922 F. Supp. 724, 728 (N.D.N.Y. 1996) (explaining, in case where suspect volunteered consent to search his vehicle, that "the trooper did not have an affirmative duty to advise defendant that he may refuse to consent to a search of the vehicle").

---

[8] *See generally United States v. O'Brien*, 498 F. Supp. 2d 520, 536-37 (N.D.N.Y. 2007) (listing relevant subjective factors, including, age, intelligence, education, the influence of drugs, legal experience, mental health, and demeanor) (citing *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983); *United States v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001)).

Because, based upon the totality of the circumstances, a reasonable law enforcement officer would understand that Ms. Winfield was voluntarily providing consent to search her vehicle when, unsolicited, she at least twice offered Trooper Trottier the opportunity to "look," and because no reasonable juror could conclude otherwise, no Fourth Amendment violation may be found with regard to this aspect of Trooper Trottier's encounter with Plaintiffs. *See United States v. Reyes*, 2007 WL 419636, at \*5 (D. Conn. Jan. 30, 2007) ("Because Reyes gave his consent without even being prompted, and because Agent Perez did not coerce, intimidate, or trick Reyes into believing that he had the lawful authority to search, Reyes's consent to search . . . was voluntary."). The scope of Ms. Winfield's consent, however, poses a much closer question.

### b.   *The Scope of Ms. Winfield's Consent.*

Plaintiffs argue that even if Ms. Winfield is deemed to have given voluntary consent to search, she limited her consent to a search of the vehicle's trunk. Like voluntariness, the scope of consent is a question of fact based upon the totality of the circumstances, and the government must prove that a search was within the scope of the authorization given. *See United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251.

Although scope of consent is often defined by the object of the search (e.g., drugs, weapons, cash), a person may otherwise limit the scope of his or her consent by words or actions. *See Jimeno*, 500 U.S. at 251 ("a suspect may of course delimit as he chooses the scope of the search to which he consents"). The Second Circuit has held that "an individual who consents to a search of his car," even if unaware of what the search is aiming for, "should reasonably expect that readily opened, closed containers discovered inside the car will be opened and examined." *United States v. Snow*, 44 F.3d 133, 135 (2d Cir. 1995). This is because if "the consent to search is entirely open-ended, a

13

reasonable person would have no cause to believe that the search will be limited in some way." *Id*. The court explained that the plain meaning of the word "'search' implies something more than a superficial, external examination. It entails 'looking through,' 'rummaging,' 'probing,' 'scrutiny,' and 'examining internally.'" *Id*. at 135-36. This remains the rule even when the officer asks to "look" as opposed to "search." *See United States v. Diaz*, 210 F.3d 356, 2000 WL 357680, at *3 (2d Cir. Apr. 5, 2000) (recognizing that *Snow* applies when an officer requests to "look in," "look through," or "take a look at" a vehicle); *United States v. McWeeney*, 454 F.3d 1030, 1034-35 (9th Cir. 2006) ("[W]e write simply to clarify the rule in this Circuit, that a request from a law enforcement agent to 'look,' in the proper context, is the same as a request to 'search.'"); *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667-68 (5th Cir. 2003) ("[I]t is established law in this Circuit, and others, that a request to 'look in' a vehicle is the equivalent for general consent to search"). Trooper Trottier contends that the same reasoning should apply here, because Ms. Winfield provided consent in equally broad terms, saying, "you can look" and "be my guest."

Although *Snow* stands for the proposition that Ms. Winfield's generalized invitations to "look" authorized a full blown search of the vehicle and its containers, it does not answer whether her ambiguous statements such as "Inside my trunk?" and "I was just going to pop my trunk" are sufficient to narrow the scope of her consent. In addition, the court must consider whether Trooper Trottier's expressed concern that the vehicle contained "guns," "bombs," or "large sums of money" further cabined the scope of his search to areas and containers in the vehicle that reasonably could conceal those items.

The court finds no authority for imposing upon Trooper Trottier an affirmative duty to ask clarifying questions regarding any limitations on consent although that certainly would have been the better practice. *See United States v. Chisholm*, 2009 WL 29313, at *6 (E.D.N.Y. Jan. 5, 2009) ("While the law does not require 'clarification' *per se*, consent—whether demonstrated by words, acts, or conduct—is determined by whether a reasonable person would have understood consent to have been granted. If a

14

reasonable person would not have found Defendant's statement to constitute consent, more is required to reach an objective threshold.") (internal citation omitted).[9]  In this case, clarification was not required because Ms. Winfield's statements with regard to her vehicle's trunk were in the form of a question and an offer to provide assistance, rather than an explicit limitation on the scope of the search.

However, Trooper Trottier, himself, limited the scope of the search when he identified for Ms. Winfield the items for which he would search. When a law enforcement officer advises an individual of the items for which a search is requested, and consent is thereafter given, the designated items generally dictate the nature and extent of the search. *See Jimeno*, 500 U.S. at 251 ("The scope of a search is generally defined by its expressed object" and when a suspect does not place "any explicit limitation on the scope of the search" and an officer states he is looking for narcotics, "[w]e think it was objectively reasonable for the police to conclude that general consent to search respondent's car included consent to search containers within that car which might bear drugs."); s*ee also United States v. Siwek*, 453 F.3d 1079, 1085 (8th Cir. 2006) (general consent to search for identified items permits officer "to search any part of the truck where these items might be stored.").

Examining the totality of the circumstances in the light most favorable to Plaintiffs, the court concludes that a reasonable person would have understood that Trooper Trottier wanted to search Plaintiffs' vehicle for guns, bombs, and large sums of money, and Ms. Winfield consented to let him search her vehicle, including its trunk, for that purpose. The conclusion that Ms. Winfield's consent was not limited to the vehicle's trunk is buttressed not only by the words exchanged by the parties, but by the fact that Ms. Winfield did not voice an objection when the search proceeded beyond the vehicle's trunk, even though she spoke to Trooper Trottier in the course of the search. *See*

---

[9] At least one circuit has held that "the defendant, as the individual knowing the contents of the vehicle, has the responsibility to limit the scope of the consent" [and] "if he deemed it necessary to do so, he should have limited his consent to clarify any ambiguity from which he now seeks to benefit." *Mendoza-Gonzalez*, 318 F.3d at 667 (internal quotation marks and citations omitted).

*Carreno-Arias*, 2002 WL 31890949, at *5 (noting defendant's lack of objection as one factor in analysis of whether there was implied consent).

However, no reasonable understanding of the exchange between Ms. Winfield and Trooper Trottier could be construed as consent for Trooper Trottier to read Ms. Winfield's mail, regardless of to whom or from whom it was addressed. The mail in question pertained to Ms. Winfield's husband who was not present in the vehicle, and Trooper Trottier does not contend that it constituted contraband or was evidence of criminal activity by any of the vehicle's occupants.[10] Although he concedes he does not recall reading mail previously in any vehicle search he has conducted, he did so in this case because it might reveal evidence of criminal activity by Ms. Winfield's husband such as a violation of conditions of release, probation, or parole. He did not ask Ms. Winfield for permission to read her mail, and nothing either party did or said provided reasonable notice that the search would involve this level of intrusion. *See United States v. Alverez*, 235 F.3d 1086, 1088 (8th Cir. 2000) ("A search resulting from an individual's general statement of consent is limited by boundaries of reasonableness"). Accordingly, the court finds that Trooper Trottier exceeded the scope of Ms. Winfield's consent insofar as his search included reading mail contained in the vehicle. With regard to all other aspects of the search, it was at least possible that guns or money could be located in the areas searched, and Ms. Winfield's consent to search was broad enough to extend to those areas.

### 2. Whether the Constitutional Right at Issue Was Clearly Established.

Having found that Trooper Trottier exceeded the scope of Ms. Winfield's consent in his search of her vehicle, the court turns to the question of whether Trooper Trottier is nonetheless entitled to qualified immunity because the constitutional right at issue was not clearly established.

---

[10] Even if Trooper Trottier could have reasonably believed that large amounts of currency were concealed in the envelope - an untenable position based upon the facts before the court - reading the correspondence contained therein was unreasonable after he was certain that the envelope contained no currency.

16

To determine whether a right is clearly established, courts in the Second Circuit look to "(1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). While this inquiry is focused on the specific circumstances in a particular case, it does not mean that "an official action is protected by qualified immunity unless the very same action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Instead, the question is whether pre-existing law from this and other circuits makes it "apparent," or provides officers with "fair warning," that the specific conduct in question is unlawful. *Id.*; *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Scott*, 616 F.3d at 105 (explaining that courts may rely on precedent from other circuit courts of appeals in deciding that a right is clearly established and declining to grant qualified immunity). This standard ensures that "all but the plainly incompetent or those who knowingly violate the law" will be protected by qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Trooper Trottier is thus entitled to qualified immunity if it would have been reasonable for him to believe that his search of the vehicle did not violate Ms. Winfield's Fourth Amendment rights.

The court starts with the proposition that Trooper Trottier knew that his search was supported by neither a reasonable suspicion of criminal activity nor probable cause, but rather was entirely dependent upon Ms. Winfield's consent. It was well-established at the time of the search that "[i]t is a violation of a suspect's Fourth Amendment rights for a consensual search to exceed the scope of the consent given." *McWeeney*, 454 F.3d at 1034 (citing *Jimeno*, 400 U.S. at 252). Accordingly, Trooper Trottier's Fourth Amendment violation was of a firmly established right that had been identified with reasonable specificity in both Supreme Court and circuit court precedent. Against this backdrop, the court must determine if reasonable law enforcement officers could disagree as to the lawfulness of his activities. *See Walczyk*, 496 F.3d 139, 154 (2d Cir. 2007) ("[e]ven if the right at issue was clearly established in certain respects . . . an officer is

still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context"). Here, the court finds no room for disagreement.

The privacy of one's papers is at the heart of the Fourth Amendment. *See* U.S. CONST., amend. 4 ("The right of the people to be secure in their . . . papers, and effects, against unreasonable searches and seizures, shall not be violated."). This principle extends with equal force to the mail. *See Ex Parte Jackson*, 96 U.S. 727, 733 (1877) ("No law of Congress can place in the hands of officials connected with the postal service any authority to invade the secrecy of letters . . . in the mail; and all regulations adopted as to mail matter of this kind must be in subordination to the great principle embodied in the fourth amendment of the Constitution.").

Moreover, even "[w]hen a search is premised upon a general, limitless statement of consent, enforcement officers do not have carte blanche over the domain where consent was given. The reasonableness superstructure of the Fourth Amendment still applies, and demarcates the bounds of a consensual search." *Mendoza-Gonzalez*, 318 F.3d at 669. In this case, officers of reasonable competence could not differ as to the conclusion that it was unlawful for Trooper Trottier to read Ms. Winfield's mail. The court therefore concludes that Trooper Trottier is not entitled to qualified immunity with regard to his violation of Ms. Winfield's Fourth Amendment rights. With regard to this aspect of Count Three of Plaintiffs' Complaint, Trooper Trottier's motion for summary judgment is DENIED.

### 3. *Trooper Trottier's Pat-down of Mr. Winfield.*

Plaintiffs argue that Trooper Trottier's pat-down of Jason Winfield violated the Fourth Amendment because Trooper Trottier did not have a reasonable suspicion to believe that Mr. Winfield posed a safety risk or was concealing evidence of a crime, and because Mr. Winfield did not consent to the search. As with the vehicle search, Trooper Trottier does not contend that either probable cause or a reasonable suspicion of criminal activity justified the pat-down. Instead, he argues that Mr. Winfield validly consented to the pat-down both verbally and through his conduct.

18

Absent consent, the Fourth Amendment does not permit officers to perform pat-downs of passengers in a vehicle during a traffic stop unless "the police . . . harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 787 (2009). Thus, in light of Trooper Trottier's concessions, the pat-down of Mr. Winfield constitutes a Fourth Amendment violation unless Mr. Winfield provided consent. Consent need not be expressed verbally, but "can be found from an individual's words, acts or conduct." *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988).

In this case, Trooper Trottier asked for Mr. Winfield's permission to conduct the pat-down amidst several other statements and questions about objects on Mr. Winfield's person:

> "Listen, your mother has given me permission to search the vehicle. Do you have anything on you? You're going to be standing out with this trooper right here. Do you mind if I pat you down real quick to make sure you don't have any guns or knives or anything? Do you have anything sharp on you I should know about?"

In response to these questions, Mr. Winfield said "no" and raised and extended his arms. Mr. Winfield does not dispute that he was "stretching or extending [his] arms" out from his body so that Trooper Trottier could conduct the pat-down (Doc. 44-5 at 7:10-22), although he claims that Trooper Trottier was still speaking to him as he patted him down.[11]

The pat-down took place on a public highway in the midst of traffic, was accomplished in a matter of seconds, and was not in response to a threat or show of force. Although few facts are known about Mr. Winfield, he appeared to be a young adult in no obvious distress.

Several courts, including the Supreme Court, have recognized that such conduct in response to an officer's request constitutes valid consent to a pat-down search. *See, e.g.,*

---

[11] Trooper Trottier also claims that Mr. Winfield shrugged his shoulders in addition to raising his arms, and that this fact further demonstrates Mr. Winfield's consent to the pat-down. However, the cruiser video does not clearly depict Mr. Winfield shrugging his shoulders, and he denies doing so.

*United States v. Drayton*, 536 U.S. 194, 199-200, 206 (2002) (recognizing that consent was provided when officer said, "Mind if I check you?" and suspect responded by lifting his hands about eight inches from his legs, permitting officer to conduct pat-down of the suspect's thighs); *United States v. Wilson*, 895 F.2d 168, 172 (4th Cir. 1990) (finding that suspect consented to pat-down search by shrugging his shoulders and raising his arms); *United States v. Smith*, 260 F.3d 922, 925 (8th Cir. 2001) (affirming denial of suppression motion because, "at the very least, Smith indicated his consent to [a pat-down] search by raising his hands."); *United States v. Mendoza-Cepeda*, 250 F.3d 626, 627-29 (8th Cir. 2001) (finding that suspect consented to search of torso by raising his arms in response to officer request to search torso); *United States v. Jackson*, 1998 WL 386119, at *2 (4th Cir. June 19, 1998) ("we conclude that Jackson effectively conveyed his consent to a patdown of his person when he stepped toward [the officer] with his arms raised from his sides in response to [the officer's] request").

Examining the totality of the circumstances in the light most favorable to Plaintiffs, no reasonable juror could conclude that Mr. Winfield failed to provide consent for the pat-down through his words and actions. Accordingly, the pat-down search did not violate Mr. Winfield's Fourth Amendment rights as a matter of law. *See Carreno-Arias*, 2002 WL 31890949, at *5 (finding valid consent even in the absence of verbal confirmation where defendant's "actions constituted an implicit consent to enter and search the room."). Having determined that no constitutional violation has been established, the court need not examine Trooper Trottier's entitlement to qualified immunity further. *See Walczyk*, 496 F.3d at 154. Trooper Trottier's motion for summary judgment with regard to the pat-down search of Jason Winfield is therefore GRANTED.

### 4.   *The Duration of the Traffic Stop.*

Plaintiffs allege that Trooper Trottier violated their Fourth Amendment rights because he "had no lawful basis to expand [his] investigatory stop of the Plaintiffs by detaining them for the length of time and in the manner that [he] did[.]" (Doc. 1 ¶¶ 29-32.) Trooper Trottier contends that the Plaintiffs were detained for a reasonable period of time, and that the duration of the traffic stop was therefore lawful.

20

While there is no *per se* time limit on the duration of a permissible investigatory stop (including traffic stops), the stop must not last longer than is necessary to effectuate its purpose. *See United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995); *Florida v. Royer*, 460 U.S. 491, 500 (1983). To detain someone longer than is necessary to effectuate the original purpose of the stop, officers must be acting either on probable cause to arrest, or reasonable suspicion of additional criminal activity. *See Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007); *United States v. Sugar*, 322 F. Supp. 2d 85, 92-93 (D. Mass. 2004).

As part of an investigatory stop related to a traffic violation, officers may ask for the driver's license and registration, ask the driver about her destination or purpose, run a computer check on the driver's information, and issue a citation. *See United States v. Brugal*, 209 F.3d 353, 358 (4th Cir. 2000); *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994); *Untied States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993). Moreover, "mere police questioning does not constitute a seizure," *Muehler v. Mena*, 544 U.S 93, 101 (2005), and an "officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the stop." *Arizona*, 129 S. Ct. at 788.

In this case, the initial detention of Plaintiffs was justified by the suspected speeding violation while Trooper Trottier collected Ms. Winfield's driver's license and registration, inquired about the purpose of her trip, and ran a computer check on her information. The computer check took longer than usual, but it is undisputed that this delay was caused by an increase in the amount of road traffic and police presence on that particular day.

While still waiting for the computer information, Trooper Trottier asked Ms. Winfield if she would be willing to speak with him outside the vehicle, and advised her that she "[didn't] have to if [she] [didn't] want to[.]" As this question did not "measurably extend the stop," it implicated no Fourth Amendment concerns. *See United States v. Crain*, 33 F.3d 480, 485 (5th Cir. 1994) ("when questioning takes place while officers are waiting for the results of a computer check—and therefore does not extend

21

the *duration* of the [traffic] stop—the questioning does not violate *Terry* [*v. Ohio*]."). Through her conduct of opening the driver's side door, exiting the vehicle, and walking behind the vehicle, Ms. Winfield consented to speaking further with Trooper Trottier.[12]

At this point, and as long as the encounter remained consensual, Trooper Trottier remained free to question Ms. Winfield even if such questioning extended the length of the original stop, and even if Trooper Trottier had no reasonable suspicion of additional criminal activity. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions . . . . [t]he encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature."); *United States v. Peterson*, 100 F.3d 7, 10 (2d Cir. 1996) ("[i]n a consensual encounter, which need not be based on suspicion, officers may permissibly ask questions" without implicating the Fourth Amendment); *United States v. Lattimore*, 87 F.3d 647, 652-53 (4th Cir. 1996) (finding that further questioning unrelated to purpose of traffic stop did not constitute a "seizure" for Fourth Amendment purposes because it was consensual).

After speaking with Trooper Trottier for approximately one minute, Ms. Winfield volunteered her consent to search the vehicle. From that point, the detention was prolonged by the vehicle search to which Ms. Winfield consented, and was therefore "consensual so long as the scope of the search did not exceed the consent given." *United States v. Purcell*, 236 F.3d 1274, 1279 n.8 (11th Cir. 2001). In this case, however, the court has determined that the scope of the search exceeded the scope of Ms. Winfield's consent. The court, however, has no facts before it that would allow it to determine how long the non-consensual aspect of the search (the reading Ms. Winfield's mail) prolonged the detention for an otherwise consensual search. Neither party has briefed the issue of whether a *de minimus* delay is sufficient to trigger a Fourth Amendment violation and, if so, whether the requirements for qualified immunity are nonetheless established. Because the record before the court is insufficient to make these determinations, the court

---

[12] Plaintiffs have not argued that Ms. Winfield's decision to exit her vehicle and speak to Trooper Trottier was involuntary.

22

hereby DENIES WITHOUT PREJUDICE Trooper Trottier's motion for summary
judgment with regard to the duration of the stop.

### D.    Plaintiffs' Equal Protection Claims.

Plaintiffs allege that their Fourteenth Amendment rights to equal protection of the
laws were violated when, "[i]n searching, seizing, and detaining the Plaintiffs, [Trooper
Trottier] intentionally treated them differently than members of a similarly situated
unprotected class because of their race[.]" (Doc. 1 ¶ 50.)  Essentially, Plaintiffs allege
that Trooper Trottier's decision to initiate further investigation of Plaintiffs beyond the
speeding violation was motivated by Plaintiffs' race, and therefore violated the
Fourteenth Amendment.  Trooper Trottier argues that he is entitled to summary judgment
on these claims because Plaintiffs cannot show that he treated similarly situated people of
a different race more favorably, and because there is insufficient evidence that he acted
with discriminatory intent.

The Equal Protection Clause of the Fourteenth Amendment requires that state
governments treat all similarly situated people alike.  *See City of Cleburne v. Cleburne
Living Ctr.*, 473 U.S. 432, 439 (1985).  To succeed on a claim challenging law
enforcement conduct under the Equal Protection Clause, a plaintiff must demonstrate that
the conduct "had a discriminatory effect and that it was motivated by a discriminatory
purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985); *see also Farm Labor Org.
Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th Cir. 2002) (applying this
standard to claim that Hispanic vehicle occupants were unlawfully singled out for further
investigation into their immigration status after being stopped for driving with a broken
headlight).

As to the "discriminatory effect" requirement, the parties do not agree on what
showing Plaintiffs must make for their claims to survive summary judgment.  Trooper
Trottier urges the court to apply the standard set forth in *United States v. Armstrong*, 517
U.S. 456, 465 (1996), a case involving a claim of selective prosecution.  There, the Court
held that, to "establish discriminatory effect in a race case, the claimant must show that
similarly situated individuals of a different race were not prosecuted." *Id.*  Trooper

23

Trottier asserts that because Plaintiffs allege that he "selectively enforced" the law based upon race, their claims fall squarely within *Armstrong*.

Plaintiffs argue that the applicable framework is set forth in *Pyke v. Cuomo*, 258 F.3d 107 (2d Cir. 2001), which omits the requirement of proving "the existence of a similarly situated group of non-minority individuals that were treated differently" to allege that a "facially neutral law or policy has been applied in an intentionally race-based manner[.]" *Id.* at 109-10 (internal quotation marks omitted). Trooper Trottier rejoins that *Pyke* is part of a "narrow line of cases" that apply only "when the alleged discrimination is so overt, widespread, and successful that the discriminatory effects are independently demonstrated or can readily be presumed." (Doc. 62 at 5.)

Trooper Trottier's narrow view of *Pyke* is mistaken. In *Pyke*, the Second Circuit explicitly limited the applicability of *Armstrong* to cases of selective *prosecution*, not selective law enforcement claims made against police officers. As *Pyke* and other cases have explained, the *Armstrong* rule is based upon the special deference courts owe to prosecutorial discretion, and the separation of powers implications that arise when courts interfere with charging decisions made by the executive. *See Pyke*, 258 F.3d at 109 ("a plaintiff alleging a claim of selective *prosecution* . . . must plead and establish the existence of similarly situated individuals who were not prosecuted; that is because courts grant special deference to the executive branch"); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1071 (9th Cir. 2004) (explaining that *Armstrong* did not apply because the plaintiff "is not challenging the *prosecutor's* decision to initiate criminal proceedings") (citing *Pyke*, 258 F.3d at 109-10); *Rodriguez v. California Highway Patrol*, 89 F. Supp. 2d 1131, 1140-41 (N.D. Cal. 2000) (distinguishing *Armstrong* because there "the Court . . . emphasized that the judiciary owes special deference to the prosecutorial office"). "Law enforcement officers, in contrast, never have been afforded the same [deference][.]" *Rodriquez*, 89 F. Supp. 2d at 1141.

Moreover, nothing in *Pyke* or subsequent cases suggests that it requires a showing of discrimination that is particularly "widespread" or "successful." To the contrary, *Pyke* "dispenses with the need to [show] that a similarly situated group was

24

treated differently because," whenever "racially discriminatory intent infects the application of a neutral law or policy, . . . adverse [discriminatory] effects can be presumed." *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 543 (S.D.N.Y. 2006); *see also Snoussi v. Bivona*, 2010 WL 3924683, at \*3 (E.D.N.Y. Sept. 29, 2010) ("Equal protection claims that are predicated on allegations of intentional discrimination do not require a plaintiff to plead the disparate treatment of similarly situated individuals."); *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997) ("If law enforcement . . . takes steps to initiate an investigation of a citizen based . . . upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred."). Therefore, outside the context of selective prosecution, *Pyke* applies to claims of intentional racial discrimination arising out of enforcement of neutral laws. *See Doe*, 462 F. Supp. 2d at 543 (applying *Pyke* and noting "a government that sets out to discriminate intentionally in its enforcement of some neutral law or policy will rarely if ever fail to achieve its purpose"); *see also Coward v. Town and Vill. of Harrison*, 665 F. Supp. 2d 281, 303 (S.D.N.Y. 2009) (applying *Pyke* in case where plaintiff alleged the he was arrested for disorderly conduct because of his race); *Aikman v. Cnty. of Westchester*, 491 F. Supp. 2d 374, 383 n.4 (S.D.N.Y. 2007) (applying *Pyke* rather than *Armstrong* in case where plaintiff alleged that police stopped and then decided to search his vehicle because of his race).

Under *Pyke*, Plaintiffs nonetheless retain the burden of demonstrating that Trooper Trottier made a facially neutral decision in an intentionally discriminatory race-based manner. *See Pyke*, 258 F.3d at 110 ("Plaintiffs will, of course, be required to substantiate their claim that the denial of police protection was motivated by racial discrimination"). When the issue is whether the plaintiff's race motivated the challenged action, courts employ the three-step burden shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[13] *See Howard v. Senkowski*, 986 F.2d 24, 27 (2d Cir. 1993);

---

[13] Trooper Trottier argues that the *McDonnell-Douglas* test must be limited to the Title VII context for which it was created, and that the Supreme Court said as much in

*Ford v. Wilson*, 90 F.3d 245, 248-49 (7th Cir. 1996) (applying *McDonnell Douglas* framework to Equal Protection claim brought by plaintiff alleging that officer stopped his vehicle because of his race). Under this approach, the plaintiff must first present a *prima facie* case sufficient to establish an inference of improper motivation; the party accused of discrimination must then articulate race-neutral reasons for the challenged action; and finally, the plaintiff bears the ultimate burden of persuasion to show that the articulated reasons are pretextual and that the "real" reason is the impermissible one. *See Howard,* 986 F.2d at 25; *see also Coward*, 665 F. Supp. 2d at 303. Whether the defendant acted with discriminatory purpose, and whether his proffered race-neutral explanations are pretextual, are "pure questions of fact." *Cornwell v. Robinson*, 23 F.3d 694, 706 (2d Cir. 1994) (internal quotation marks omitted).

Although the burden to defeat summary judgment at the *prima facie* stage has been described as "de minimus," *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994), Plaintiffs must nonetheless "proffer[] admissible evidence . . . sufficient to permit a rational finder of fact to infer a discriminatory motive." *Id.* Only after Plaintiffs make this showing is Trooper Trottier obligated to put forth race-neutral explanations for the challenged conduct.

---

*Washington v. Davis*, 426 U.S. 229, 239 (1976). The Second Circuit has squarely rejected this argument:

> Though pretext analysis was developed in Title VII cases, such as . . .
> *McDonnell Douglas*, it is fully applicable to constitutional claims where the
> issue is whether an improper motive existed . . . *Washington v. Davis*
> distinguished Title VII standards from equal protection standards only to the
> extent of ruling that disparate impact analysis, permitted to establish a Title VII
> violation, would not suffice for an equal protection violation. Nothing in *Davis*
> or subsequent constitutional decisions lessens the relevance of pretext analysis
> to equal protection cases.

*Howard v. Senkowski*, 986 F.2d 24, 27 n.2 (2d Cir. 1993) (internal citations omitted);
*see also Frenkel v. New York City Off-Track Betting Corp.*, 701 F. Supp. 2d 544, 554
(S.D.N.Y. 2010) ("[d]isparate treatment claims under Section 1983 are evaluated
pursuant to the same three-part burden shifting inquiry established for Title VII actions
. . . in *McDonnell Douglas*").

Here, Plaintiffs attempt to meet their burden at the *prima facie* stage without the benefit of any direct evidence of intentional discrimination. For example, there is no evidence that Trooper Trottier used a racial slur or made any comments about Plaintiffs' race or ethnicity. *Cf. Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999) (noting that an isolated comment can constitute direct evidence of purposeful discrimination when made contemporaneously with the challenged conduct); *Snoussi,* WL 3924683, at *5 (alleging that defendant officers referred to plaintiff as a "fucking Arab" and a "fucking terrorist"). Plaintiffs further concede that they cannot establish that Trooper Trottier has treated similarly situated people of another race more favorably. *See Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("showing that the [defendant] treated plaintiff less favorably than a similarly situated [person] outside his protected group . . . is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case"); *United States v. Travis*, 62 F.3d 170, 174 (6th Cir. 1995) ("In the absence of other proof, persuasive statistical evidence about a larger population of [other] encounters may also create a strong inference that officers chose to engage in a particular consensual interview . . . because of the interviewee's race.").

Instead, Plaintiffs merely assert that Trooper Trottier engaged in atypical conduct in reading Ms. Winfield's mail and, as a white law enforcement officer, decided to further investigate two African Americans without probable cause or reasonable suspicion of criminal activity.[14]  Standing alone, this does not demonstrate that the investigation "occurred under circumstances giving rise to an inference of invidious discrimination." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). Put differently, evidence showing that the challenged conduct was *arbitrary* is not enough to

---

[14] Plaintiffs also point to a letter Ms. Winfield received from the Vermont State Police Office of Internal Affairs informing her that the Vermont "Commissioner of Public Safety . . . has concluded the actions of Trooper Daniel Trottier did violate the Vermont State Police Code of Conduct, related to th[e] search" of her car. (Doc. 57-5.)  The letter, however, does not support an inference of intentional discrimination because it also states that "[t]here was no evidence to indicate that this was a racially motivated incident." *Id.*

27

permit an inference that it was *intentionally discriminatory*. *See Purkett v. Elem*, 514 U.S. 765, 768-69 (1995) (noting that, in the Fourteenth Amendment context, "a legitimate reason [for government conduct] is not a reason that makes sense, but a reason that does not deny equal protection").

Using this rationale in analogous circumstances, both the Eighth and Seventh Circuits have held that defendant police officers were entitled to summary judgment on plaintiffs' equal protection claims. In *Johnson v. Crooks*, 326 F.3d 995 (8th Cir. 2003), for example, an African American plaintiff alleged racial discrimination against a white police officer who followed her car for several miles, and then pulled her over without cause. The plaintiff offered neither direct evidence of discrimination, nor evidence that similarly situated people of a majority group had been treated more favorably. In finding that the plaintiff had failed "to identify affirmative evidence from which a jury could find that the plaintiff has carried . . . her burden of proving the pertinent motive," *id*. at 1000, the court explained: "[w]e do not think . . . that the combination of an arbitrary stop . . . with a difference in race between the person stopped and the officer establishes a prima facie case of racial discrimination." *Id*. (quoting *Ford v. Wilson*, 90 F.3d 245, 248-49 (7th Cir. 1996)). In *Ford*, the Seventh Circuit reached the same conclusion after a white police officer stopped an African American motorist who was driving in a lawful fashion. *Ford*, 90 F.3d at 248. If it were otherwise, then "any time a black arrested a white, or a white arrested a black, the person arrested could, by testifying that the arrest had been groundless, obtain a trial in federal court under 42 U.S.C. § 1983." *Id*. at 249; *see also United States v. Frazier*, 408 F.3d 1102, 1108-1109 (8th Cir. 2005) ("Whether the officers acted on a legitimate 'hunch' or even arbitrarily in their investigation, [the plaintiff] lacks sufficient proof of discrimination to proceed with" his equal protection claim).

Similarly here, even assuming that Trooper Trottier had no reason to believe that Plaintiffs were engaged in unlawful activity (other than speeding), his arbitrary conduct combined with their different race is not evidence from which a reasonable jury could infer intentional racial discrimination. Accordingly, Plaintiffs have not met their burden

28

of establishing a *prima facie* case of intentional racial discrimination. The court therefore GRANTS Trooper Trottier's motion for summary judgment on Plaintiffs' Fourteenth Amendment equal protection claim.

### E.    State Law Claims.

Counts seven through eighteen of Plaintiffs' Complaint allege causes of action arising under Vermont common law and the Vermont Constitution. Specifically, Plaintiffs allege false imprisonment, intentional infliction of emotional distress, invasion of privacy, and unreasonable searches and seizures under Chapter I, Article Eleven of the Vermont Constitution. For these claims, Plaintiffs invoke the court's supplemental jurisdiction, which permits the court to hear state law claims that are so related to the federal causes of action over which it has original jurisdiction that they form part of the same case or controversy. *See* Doc. 1 ¶ 2 (pleading supplemental jurisdiction); 28 U.S.C. § 1367(a).

### 1.    Intentional Infliction of Emotional Distress.

Plaintiffs allege that, in choosing to further investigate them because of their race, Trooper Trottier engaged in "outrageous conduct" that constitutes intentional infliction of emotional distress. (Doc. 1 ¶ 71.) In Vermont, in order to sustain such a claim, a plaintiff must establish "extreme and outrageous conduct, done intentionally or with reckless disregard of the probability of resulting emotional distress to [Plaintiffs], that has in fact resulted in extreme emotional distress." *Siliski v. Allstate Ins. Co.*, 174 Vt. 200, 208, 811 A.2d 148, 155 (2002). To survive summary judgment, there must be sufficient evidence from which a reasonable jury could find that the conduct in question was "so outrageous and extreme as to 'go beyond all possible bounds of decency,'" *Jobin v. McQuillen,* 158 Vt. 322, 327, 609 A.2d 990 (1992) (quoting *Demag v. American Ins. Co.,* 146 Vt. 608, 611, 508 A.2d 697 (1986)).

In this case, Plaintiffs concede that they cannot demonstrate that Trooper Trottier exhibited the requisite "outrageous" and "extreme" conduct without evidence that he

intentionally discriminated on the basis of race.[15]  Therefore, Trooper Trottier is entitled to summary judgment on Plaintiffs' Intentional Infliction of Emotional Distress claim for the same reasons that he is entitled to judgment on their equal protection claim.  Trooper Trottier's motion for summary judgment is hereby GRANTED with regard to Plaintiffs' intentional infliction of emotional distress claim which was the only remaining claim contained in Count thirteen and fourteen of the Complaint, after dismissal of Plaintiffs' negligent infliction of emotional distress claims.

2.    *Remaining State Law Claims.*

Plaintiffs have abandoned their remaining state law claims because they did not respond to Trooper Trottier's arguments on such claims made in his motion for summary judgment.  *See Douglas v. Victor Capital Grp.*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases).  Accordingly, Trooper Trottier is entitled to summary judgment on all of Plaintiffs' remaining state law claims.  *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way. . . . On this basis alone, the court could grant summary judgment on the state law claims[.]").

**IV.    Conclusion.**

For the reasons set forth above, Trooper Trottier's motion for summary judgment (Doc. 43) is GRANTED IN PART AND DENIED IN PART.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 21st day of September, 2011.

Christina Reiss, Chief Judge
United States District Court

---

[15] At oral argument, the Plaintiffs conceded this was one of their "weaker claims," and that they were no longer claiming the requisite showing could be made in the absence of racial discrimination.